1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

8   CARLOS HENDON,                              Case No. 1:05 cv 01247 AWI GSA PC

9              Plaintiff,

10   vs.                                         FINDINGS AND RECOMMENDATION RE
                                                 DEFENDANTS' MOTIONS FOR
11   BAROYA, et al.,                             SUMMARY JUDGMENT (ECF NOS. 93,
                                                 107)
12              Defendants

13                                               OBJECTIONS DUE IN THIRTY DAYS

14

15   **I.**    **Procedural History**

16          Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this civil rights

17   action pursuant to 42 U.S.C. § 1983.  This proceeding was referred to this court by Local Rule

18   302 pursuant to 28 U.S.C. § 636(b)(1).   Pending before the Court are Defendants' motions for

19   Summary judgment.  Plaintiff has opposed the motions.[1]

20

21          This action proceeds on the  June 26, 2008, second amended complaint.  Plaintiff alleges

22
23

24          [1] On May 14, 2009, the Court issued and sent to Plaintiff the summary judgment notice required
     by Rand v. Rowland, 154 F.3d 952 (9th Cir. 1998), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  (ECF
25   No. 27).  The order was re-served on Plaintiff on October 3, 2012, in response to the Ninth Circuit's decision in
     Woods v. Carey, 684 F.3d 934 (9th Cir. 2012) (ECF No. 97).
26                                                   1
27
28

that  he was repeatedly placed in secure cells where inmates were on suicide watch from June 6, 2002,  to January 2003.  Plaintiff alleges that during this time he was limited to having the minimum  of certain items.  For example, he was given only a thin blanket which he states was sometimes  dirty and stained, the heat was inadequate for the winter months and that his requests to increase  the heat went unfulfilled.  Plaintiff alleges that he was sometimes kept in his cell for days or weeks covered in his  own excrement, subjected to constant illumination and sometimes placed in a cell next to a psychotic inmate who would scream and beat on the doors resulting in a loss of sleep.  Plaintiff alleges that he was sometimes deprived of toilet paper on the basis that he might use it to cover his cell window, was deprived of showers while confined in the infirmary, and the cells were not cleaned when one inmate was removed and another took his place.   Plaintiff alleges that the Defendants were aware of these conditions which, he contends, resulted in pain, cramps, chills, lower back and neck pain and extreme emotional anguish. Plaintiff  claims that the conditions constituted deliberate indifference under the Eighth Amendment.

On March 20, 2009, an order was entered, finding that the second amended complaint stated a  claim against Defendants Baroya, Fam, Hamilton, Nguyet, Hoppe, Griffin and Reidman for  violations of the Eighth Amendment arising out of unconstitutional housing conditions.[2]

---

[2] On July 8, 2011, an order was entered, indicating that this action is proceeding on claims of unconstitutional conditions of confinement, and not unconstitutional medical conditions.

2

On September 29, 2009 , Defendants Baroya, Pham, Nguyet, Griffin and Reidman filed an answer to  the second amended complaint.[3]  On December 13, 2010, an order was entered by the District Court, adopting the recommendation of the Magistrate Judge and dismissing Defendant Hamilton for Plaintiff's failure to provide sufficient information to locate Defendant Hamilton for service of process.  On August 1, 2011, Defendant Hoppe filed an answer.  On October 1, 2012, Defendants Baroya, Reidman, Nguyet, Griffin and Hoppe filed a motion for summary judgment.  On November  30, 2012, Defendant Pham filed a motion for summary judgment.  On January 2, 2013, Plaintiff  filed opposition to both motions.  On March 26, 2013, Defendants Baroya, Griffin, Hoppe, Nguyet and Reidman filed a reply.

## II.    **Summary Judgment Standard**

Summary judgment is appropriate when it is demonstrated that there exists no genuine Issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> [a]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

_____

[3] Plaintiff named Defendant Fam in the second amended complaint.  Defendant Fam answered as Defendant Pham in the September 29, 2009, answer.  The Court will therefore refer to Defendant Pham.

3

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).   In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson, 477 U.S. at 248; Nidds v. Schindler Elevator Corp., 113 F.3d 912, 916 (9th Cir. 1996), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Matsushita, 475 U.S. at 588; County of Tuolumne v. Sonora Community Hosp., 263 F.3d 1148, 1154 (9th Cir. 2001).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial."  Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

1

2

3        In resolving the summary judgment motion, the court examines the pleadings,

4 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.

5 Rule 56 (c).  The evidence of the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at 255,

6 and all reasonable inferences that may be drawn from the facts placed before the court must be

7 drawn in favor of the opposing party, <u>Matsushita</u>, 475 U.S. at 587 (citing <u>United States v.

8 Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)(per curiam).  Nevertheless, inferences are not drawn out

9 of the air, and it is the opposing party's obligation to produce a factual predicate from which the

10 inference may be drawn.  <u>Richards v. Nielsen Freight Lines</u>, 602 F.Supp. 1224, 1244-45 (E.D.

11

12 Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

13        Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

14 show that there is some metaphysical doubt as to the material facts.  Where the record taken as a

15 whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

16

17 issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

18        **A.       <u>Eighth Amendment</u>**

19        The Eighth Amendment protects prisoners from inhumane methods of punishment and

20 from inhumane conditions of confinement.  <u>Morgan v. Morgensen</u>, 465 F.3d 1041, 1045 (9th Cir.

21

22 2006).  Extreme deprivations are required to make out a conditions of confinement claim, and

23 only those deprivations denying the minimal civilized measure of life's necessities are

24 sufficiently grave to form the basis of an Eighth Amendment violation.  <u>Hudson v. McMillian</u>,

25 503 U.S. 1, 9 (1992) (citations and quotations omitted).  In order to state a claim for violation of

26

27                                              5

28

the Eighth Amendment, Plaintiff must allege facts sufficient to support a claim that prison officials knew of and disregarded a substantial risk of serious harm to Plaintiff.  Farmer v. Brennan, 511 U.S. 825, 847 (1994); Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

The routine discomfort in the prison setting is inadequate to satisfy the objective prong of an Eighth Amendment inquiry.  "Those deprivations denying 'the minimal civilized measure of life's necessities are grave to form the basis of an Eighth Amendment violation.'"  Id. (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994).  "The circumstances, nature, and duration of a deprivation of one of these necessities must be considered in determining whether a constitutional violation has occurred.  The more basic the need, the shorter the time it can be withheld."  Johnson v.Lewis, 217 F.3d 726, 731 (9th Cir. 2000).

## III.      Defendants' Motion

### A.      OHU Conditions and Procedures

Defendants support their motion with the declaration of Dr. Nguyet, and the declaration of D. Chinn.  Regarding the conditions and procedures of the Outpatient Housing Unit (OHU) in general and his personal knowledge of OHU procedures, Dr. Nguyet declares the following

> I am a psychiatrist, licensed in the State of California since 1996.  I
> have worked as a Staff Psychiatrist for the California Department
> of Corrections and Rehabilitation (CDCR) at the California
> Correctional Institution (CCI) for over twelve years, since March 1,

6

2000.  I am familiar with the policies and procedures for suicide watch and prevention that were in effect at CCI in 2002-2003.

As a Staff Psychiatrist at CCI, I treat mentally Ill inmates housed in the Outpatient Housing Unit (OHU) on suicide watch and suicide prevention, and ensure they receive the medications that they require.

CCI's OHU, also referred to as the "infirmary," is a small special needs housing unit; there are approximately only ten cells available. The cells in OHU are single-cells, with a toilet and sink inside the cell, and a window on the cell door designed to permit careful observation of the inmate.  The cells are virtually empty, in order to minimize the likelihood that the inmate could modify the item and use it to kill or otherwise inflict serious bodily harm upon himself.

Because the OHU resources are scarce, an inmate place on suicide watch or prevention is typically only housed in an OHU cell for one or two days, and if special housing is required for a longer period of time, the inmate is transferred to a nearby prison hospital equipped with special mental health crisis beds, such as California State Prison Corcoran, or Lancaster.

Suicide "watch" protocols are different from suicide "prevention" protocols.  When an inmate is placed in the OHU under suicide prevention, he is placed in a cell without anything that he can use to harm himself, and is checked up on every fifteen minutes by medical or correctional staff.  When an inmate is placed in the OHU under suicide watch, he is he is similarly placed in a cell without anything that he can use to harm himself, but is continuously monitored  - even when using the cell's toilet – by a staff member through the window on the cell door.  Thus, direct visual contact is maintained at all times.

When admitted to the OHU, an inmate is typically provided a "suicide blanket," "suicide mattress," and disposable paper boxer shorts.  "Suicide blankets and mattresses" are designed from a special material that cannot be torn – in order to prevent inmates

from attempting to harm themselves, such as by hanging. Similarly, the inmate is only permitted paper clothes in the OHU, since normal clothes could be torn and the cloth used to harm oneself, by, for example, hanging.  Because an inmate is only permitted paper clothing in the OHU, the OHU cells are heated.

In extreme cases, medical or custodial staff could further restrict the inmate's access to items if there was an acute risk to the inmate's safety.  For example, if an inmate attempted to harm himself by throwing himself into the walls, the use of five-point restraints would also be authorized.

Sometimes, an inmate will dirty his cell by, for example, smearing his own feces on the door and walls, or by purposely causing the cell toilet to overflow and flood the cell.  When this occurs, the inmate is taken out of his cell and placed in a holding cell or, space permitting, another OHU cell, while staff members clean the dirtied cell.

(Nguyet Decl., ¶¶ 1-8.)

While an inmate is housed in OHU, medical staff is responsible for documenting the inmate's treatment in detail.  This includes: patient complaints; observation of the patient's condition; all physician communications and notifications; all patient-involved unusual occurrences; specific observations of the patient's behavior, activity, conversation, progress or regression.  (Dfts. Ex. C, CDCR Departmental Operations Manual (DOM)§ 91040025.)

**B.  Specific Admission Dates**

Defendants' Exhibit A includes copies of OHU inpatient records, indicating that Plaintiff was placed on suicide prevention status at the OHU on the following dates:  June 6, 2002 to June 20, 2002; August 17, 2002 to August 19, 2002; September 16, 2002 to October 1, 2002; October

8

15, 2002 to October 16, 2002; November 13, 2002 to November 15, 2002; January 8, 2003 to January 10, 2003; January 17, 2003 to January 21, 2003.  In his deposition, Plaintiff admits the incidents occurred "long ago," and does not challenge the dates of admission and discharge recorded in his medical records. (Pltf. Dep. 21:17-19, 46:7-47:115.)   In his deposition, Plaintiff indicates that he was properly placed on suicide watch each time, and he did not object to being placed on suicide watch.  (Id., 22:21-15.)

      **1**.     **June 6, 2002 to June 20, 2002**

Page 2 of Exhibit A establishes that Plaintiff was admitted to the OHU on June 6, 2002, with an admitting diagnosis of depression with suicidal ideation.   At the time of his admission, Plaintiff was issued paper shorts and a suicide blanket.  (Id., p. 18.)  Plaintiff was observed hourly each day, and impressions were noted once each shift.  (Id., pp. 35-79.)   The Court has examined the entire inpatient record for Plaintiff's admission from June 6, 2002 to June 20, 2002. There are no instances where Plaintiff complains about his housing conditions.  (Id., pp. 2-79.)

      **2.**     **August 17, 2002 to August 19, 2002**

Page 82 of Exhibit A establishes that Plaintiff was admitted to the OHU on August 17, 2002,  with a chief complaint of "I'm not safe, I'm suicidal."  The admitting diagnosis was depression with suicidal ideation. (Id. p. 84.)  Plaintiff was observed hourly each day, and impressions were noted once each shift.  (Id., pp. 93-102.)   The Court has examined the entire inpatient record for Plaintiff's admission from August 17 to August 19, 2002.  There are no instances where Plaintiff complains about his housing conditions.  (Id., pp. 81-102.)

9

**3.**     <u>September 16, 2002 to October 1, 2002</u>

Page 106 of Exhibit A establishes that Plaintiff was admitted to the OHU on September 16, 2002, with a chief complaint of "I'm suicidal."  Plaintiff's admitting diagnosis was antisocial personality disorder, mood disorder secondary to polysubstance dependence.  Plaintiff was observed hourly each day, and impressions were noted once each shift.  (<u>Id.</u>, pp. 135-170.)   The Court has examined the entire inpatient record for Plaintiff's admission from September 16, 2002 to October 1, 2002.  There are no instances where Plaintiff complains about his housing conditions.  (<u>Id.</u>, pp. 106-170.)

**4.**     <u>October 15, 2002 to October 16, 2002</u>

Page 172 of Exhibit A establishes that Plaintiff was admitted to the OHU on October 15, 2002, with a chief complaint of "I'm suicidal."  Plaintiff's admitting diagnosis was antisocial personality disorder.  Plaintiff was observed hourly each day, and impressions were noted once each shift.  (<u>Id.</u>, pp. 185-193.)   The Court has examined the entire inpatient record for Plaintiff's admission from October 15, 2002 to October 16, 2002.  There are no instances where Plaintiff complains about his housing conditions.  (<u>Id.</u>, pp. 172-193.)

**5.**     <u>November 13, 2002 to November 15, 2002</u>

Page 195 of Exhibit A establishes that Plaintiff was admitted to the OHU on November 13, 2002,  with a chief complaint of "I'm going to kill myself."  Plaintiff's admitting diagnosis was antisocial personality disorder with mood disorder.  Plaintiff was observed hourly each day, and impressions were noted once each shift.  (<u>Id.</u>, pp. 208-212.)   The Court has examined the

10

entire inpatient record for Plaintiff's admission from  November 13, 2002 to November 15, 2002. There are no instances where Plaintiff complains about his housing conditions.  (Id., pp. 195-212.)

### 6.  January 8, 2003 to January 10, 2003

Page 214 of Exhibit A establishes that Plaintiff was admitted to the OHU on January 8, 2003, with the chief complaint as follows: "Inmate states he is feeling suicidal.  'Inmate tired of life in prison.'  'People play games with me, correctional officers play games with me every day.' 'I have more SHU time coming from pending CDC 115s.'"  Plaintiff's admitting diagnosis was major depressive disorder with antisocial personality disorder.  (Id.)  Plaintiff was observed hourly each day, and impressions were noted once each shift.  (Id., pp. 231-236.)   The Court has examined the entire inpatient record for Plaintiff's admission from January 8, 2003 to January 10, 2003.  There are no instances where Plaintiff complains about his housing conditions.  (Id., pp. 214-238.)

### 7.  January 17, 2003 to January 21, 2003

Page 241 of Exhibit A establishes that Plaintiff was admitted to the OHU on January 17, 2003, with a chief complaint of "I'm going to kill myself."  Plaintiff's admitting diagnosis was antisocial personality disorder.  Plaintiff was observed hourly each day, and impressions were noted once each shift.  (Id., pp. 253-266.)   The Court has examined the entire inpatient record for Plaintiff's admission from  January 17, 2003 to January 21, 2003.  There are no instances where Plaintiff complains about his housing conditions.  (Id., pp. 241-266.)

11

///

### C.    OHU Conditions

In the second amended complaint, Plaintiff alleges that, while housed in OHU, he was denied adequate clothing, subjected to cold cell temperatures and was forced to live in a cell with excrement smeared on the walls.   Specifically, Plaintiff alleges that every single time he was admitted to the OHU, he was (1) placed on suicide watch for lengthy periods of time, (2) in unsanitary cells that were covered in feces, (3) denied clothes, (4) denied a mattress or bedding of any kind, (5) denied showers and hygienic items such as soap, tooth powder, toilet paper, and disinfectant, (6) subjected to extremely cold conditions, which prevented him from sleeping and caused him to suffer pain and soreness in his lower back and neck. (Am. Compl. 18:3-5.)

### 1.    Length of Stays in OHU

The Ninth Circuit has consistently held that "ordinarily the lack of outside exercise for extended periods is a sufficiently serious deprivation"  For  Eighth Amendment purposes. LeMaire v. Maass, 12 F.3d 1444, 1457 (9th Cir. 1993). A prohibition on outdoor exercise of six weeks is a "sufficiently serious deprivation" to support an Eighth Amendment claim.  See, e.g., Lopez v. Smith, 203 F.3d 1122, 1132-33 (9th Cir. 2000)(en banc); Allen v. Sakai, 48 F.3d 1082, 1086 (9th Cir. 1994).   However, a temporary denial of outdoor exercise with no medical effects is not a substantial deprivation.  May v. Baldwin, 109 F.3d 557, 565 (9th Cir. 1997)(citing LeMaire, 12 F.3d at 1457).

Defendants correctly argue that where mentally unstable inmates are concerned, courts provide even greater leniency as to the length of cell confinement.  The Ninth Circuit has stated that "Prison officials are not culpable when they temporarily put an inmate who imminently threatens or attempts suicide in a place where he cannot hurt himself."  <u>Anderson v. County of Kern</u>, 45 F.3d 1310, 1315 (9th Cir. 1995)(holding that housing mentally disturbed inmates in "safety cells" for lengthy periods of time was not unconstitutional).

Here, Defendants' evidence establishes that Plaintiff was placed on suicide prevention watch on seven separate occasions.  The longest period of confinement was fourteen days. Defendants' Exhibit A establishes that each time Plaintiff was placed on suicide prevention watch, it was because of his own statements that he was suicidal.  The evidence establishes that Plaintiff was monitored hourly, and released from suicide prevention watch when deemed safe.

In his opposition, Plaintiff does not dispute the dates of his placement in OHU.  In support of his opposition, Plaintiff submits his own declaration, along with portions of his medical record.  Plaintiff offers no evidence that the length of any of his stays while in the OHU caused him any harm.

**2.** **<u>Cell Sanitation</u>**

1

2

3          In his second amended complaint, Plaintiff alleges that  he was "often placed in filthy,

4   sometimes feces-smeared cells. . . "  (Am. Compl. ¶ IV.)[4]  Defendants argue that Plaintiff's feces

5   covered cells do not constitute an Eighth  Amendment violation, especially because Plaintiff

6   "authored his own deprivation."   Defendants correctly argue that while exposing an inmate to a

7   lack of sanitation can constitute an infliction of pain within the meaning of the Eighth

8   Amendment, courts have held that temporary subjection to a lack of sanitation does not rise to

9   the level of a constitutional violation.   <u>Anderson</u>, 45 F.3d at 1314 (finding temporary conditions

10  in which plaintiffs were shackled to the grate of a pit toilet and complained of the lack of

11  sanitation and odor did not constitute a substantial deprivation); <u>Hutto v.Finney</u>, 437 U.S. 678,

12  686-87 (1978)(holding that temporary deprivations of sanitation are not cognizable under §

13  1983); <u>Jones v. Solano County Sheriff</u>, No. civ s 07-1937 MCE JFM P, 2008 U.S. Dist. LEXIS

14  5653, *6-7, (E.D. Cal. Jan. 25, 2008)(finding pretrial detainee's sink being backed up with foul

15  sewage for almost a week did not constitute a cognizable deprivation under § 1983); <u>Smith v.</u>

16  <u>Copeland</u>, 87 F.3d 265, 268-269 (8th Cir. 1996)(holding inmate's subjection to overflowed toilet

17  in cell for four days did not amount to constitutional violation); <u>see also</u> <u>Howard v. Adkison</u>, 887

18

19

20

21

22                                    _____

23

24          [4] The second amended complaint is signed under penalty of perjury.  A verified complaint in a pro
     se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the
25   complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief.
     <u>McElyea v. Babbitt</u>, 833 F.2d 196, 197-98 (9th Cir. 1987)(per curiam); <u>Lew v. Kona Hospital</u>, 754 F.2d 1420, 1423
26   (9th Cir. 1985); Fed. R. Civ. P. 56(c)(4).

27

28

F.2d 123, 137 (8th Cir. 1989)(holding that conditions such as a filthy cell, though intolerably cruel if endured for weeks or months, may be tolerable for a few days).

Defendants further note that where the plaintiff does not allege any harm caused by the temporarily unsanitary conditions, courts have declined to find a constitutional violation.  See Smith, 87 F.3d at 1268-69 (finding no constitutional violation – even where plaintiff was 'made to endure the stench of his own feces and urine' – because plaintiff did not allege that he was exposed to disease or suffered any other consequences of the exposure; also citing Bell v. Wolfish standard to find that the 'raw sewage' allegation amounted to a de mininis imposition).

Here, Defendants' evidence establishes that the unsanitary conditions were of Plaintiff's own making.  In his deposition, Plaintiff indicates the following:

> Q.  Now, with respect to the fact that you were placed in filthy, sometimes feces-smeared cells, can you describe what that was all about?
>
> A.  Sometimes when I was placed in the cells it had feces or blood smeared on the walls.  I complained numerous, numerous times to medical staff and my complaints failed, nobody wanted to do anything about it
>
> Q.  Can you recall who you complained to?
>
> A.  I pretty much complained to everybody, you know, during each shift.  To the doctors, to the nurses.
>
> Q.  Are there any particular individuals with respect to this lawsuit that you can recall complaining about those conditions?
>
> A.  No.

15

Q.  Mr. Hendon, did you ever create any of those conditions, particularly the feces-smeared walls that you complained of during any of –

A.  Maybe on one occasion.

Q.  Okay.  I have in front of me a copy of a document.  It is from your medical records, complete copies which were sent to you and were identified by Bates numbers.  The Bates numbers were H-E-N-B-A-R, for Hendon versus Baroya, and the numbers spanned 000001 through 000267.

I am looking at page number 000113 which is dated Friday, September 27, 2002.  The entry was made – it is a medical entry.  The entry was made – it is a medical entry.  The entry was made at 0710 in the morning, and the signature block stamp reads Julius Griffin, M.D., Psychiatrist.

Q.  Was Dr. Griffin one of your treating psychiatrists during the period of time that you were on one or more of the suicide watches?

A.  Yes, he was.

Q.  I am quoting under the subjective portion.  It indicates that it was a psychiatric consult for Dr. Baroya.  Inmate continues to smear feces on walls, on room TV monitor camera and declares, quote, I like it that way, closed quote.  Do you recall ever saying that, sir?

A.  No.

Q.  Continuing, inmate seen at cell door.  His smearing of feces over the TV monitor camera in cell precludes any sustained monitoring by room camera.  Inmate states he knows only the year, quote, 2002, close quote, but denied all current events awareness.  He says he is not, and it is underlined, going to kill himself, but won't respond to promises to stop feces spreading.  Then it has in

16

brackets, this continues to be an ongoing health hazard for himself and all others who must maintain contact with him, close bracket.

I would ask that this particular document be entered as defendants' next in order.

Q.  Mr. Hendon, do you recall that exchange or encounter with Dr. Griffin at all?

A.  No, I don't.  I do recall smearing feces on one or two occasions inside the cells.

Q.  Do you recall whether those one or two instances would have been during this seven-month period that is the subject of this lawsuit?

A.  Yes.

Q.  Okay.  And is your yes that that is when it would have occurred?

A.  Correct.

Q.  Or yes, you recall it?

A.  That's when it occurred.

(Pltf. Dep. 25:16-28:5.)

Defendants' evidence establishes that, although there were occasions where feces was smeared on the wall, Plaintiff was responsible.  Plaintiff conceded that he smeared feces on the wall on two occasions.  A review of Defendants' Exhibit A, Plaintiff's medical and OHU observation records, establishes that Plaintiff did not make a specific complaint to any of the named defendants about an unsanitary cell.

17

In opposition, Plaintiff contends that he made "numerous" complaints to medical staff about the conditions of his cell.  Plaintiff's declaration establishes that "in fact, I complained about the sanitation of my cell, about the lack of hygienic items, and about the temperature and defendants did not note any such complaint in my chart."  (Pltf. Decl. ¶6.)  Plaintiff refers to "a true and correct copy of the nursing care record. (<u>Id</u>.)

Although Plaintiff does present competent evidence that he complained about conditions in his cell, he does not come forward with any evidence that establishes that any of the named Defendants in this action knew of and disregarded a serious risk to Plaintiff's health or safety, causing him injury.  Further, Plaintiff offers no evidence that he was injured by any conduct of the Defendants.  Plaintiff declares in the second amended complaint that as a result of the lack of cleanliness he suffered "severe pain, muscle cramps, body chills, and lower back and neck pain." (Am. Compl. p. 5.)  Plaintiff does not, however, come forward with any evidence that he was diagnosed with any injury or medical condition as a result of his confinement in OHU.  The Court has reviewed all of the medical evidence submitted by Plaintiff and Defendants.  There is no evidence that Plaintiff complained to any of the named Defendants of any specific medical condition or injury suffered as a result of his stay in OHU.

**3.**   **<u>Clothing and Bedding</u>**

In the second amended complaint, Plaintiff alleges that he was placed in the OHU "virtually unclothed . . clad only in paper underwear,  with no mattress or bedding of any kind." Defendants' evidence establishes that Defendants and treating personnel provided him with a t-

18

shirt, boxers, and socks, and that Plaintiff made no complaints regarding his housing conditions. (Ex. A. 2-79, 106-170, 195-97, 214-39.)   Further, Defendants offer evidence that in an earlier lawsuit regarding the exact same incidents, Plaintiff attests that he was provided too many clothes (which posed a danger to him in his suicidal condition, since he could use the clothes to harm himself).   In case number 1:05 cv 838, in the July 31, 2006, second amended complaint, Plaintiff alleged under penalty of perjury that "the cells were not equipped for suicidal inmates because they had surfaces with which I could harm myself, and contained items such as clothing, sheets, towels, and other things that could be used to tie and suspend items."  (Am. Compl. ¶ 14.)[5]   This case does not turn on whether Plaintiff was provided only shorts and a blanket or a complete set of clothing items.  Plaintiff may only hold Defendants liable by submitting evidence that Defendant(s) knew of and disregarded a serious risk to Plaintiff's safety or health, resulting in injury to Plaintiff.  Defendants correctly argue that courts do not find Eighth Amendment violations where the conditions of confinement are imposed on mentally disturbed inmates for their own safety.  Anderson, 45 F.3d at 1315.

Further, Defendants' evidence establishes that Defendants were acting pursuant to existing protocols and procedures for inmates housed in OHU.  (Dfts. Ex. C, p. 339.)   This case is proceeding against individual Defendants for their conduct while Plaintiff was housed in OHU.

---

[5] The Court may take judicial notice of court records in another case.  Fed. R. Eviid. 201; See United States v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980)(stating that a court may take judicial notice of court records in another case).

There is no cause of action challenging the constitutionality of the OHU procedures and

protocols.  Nevertheless, Defendants' evidence establishes that none of the Defendants authored

the operational procedures or policies regarding inmate medical services that were in effect

between June, 2002 and January, 2003, nor did they have the authority to disregard them.

(Nguyet Decl. ¶10; Griffin Decl. ¶5; Hoppe Decl. ¶5.)

    **4.**    <u>**Showers and Hygienic Items**</u>

In the second amended complaint, Plaintiff alleges that he was "not allowed to shower

nor got a change of underwear for the entire relevant time during those periods."  (Am. Compl. p.

4.)  Plaintiff also alleges that he was "denied toilet paper during those times, on the pretext that

he might misuse it to cover cell windows, and he was not permitted to have cleaning and

hygienic supplies (i.e. soap, tooth powder, disinfectant, etc.).  He was without means to brush his

teeth and clean his hands and body after performing bodily functions."  (<u>Id</u>.)

As with Plaintiff's claim regarding denial of clothing, Defendants argue that courts do not

find Eighth Amendment violations where the conditions of confinement are imposed on mentally

disturbed inmates for their own safety.  <u>Anderson</u>, 45 F.3d at 1315.  As noted above, in the

earlier lawsuit, Plaintiff's central claim was that, while house in OHU on suicide prevention, he

was provided with too many items – Plaintiff admitted that he should not have been permitted to

have certain property because he could have hurt himself with it.  Further, a review of

Defendants' Exhibit A reveals that Plaintiff never complained of the lack of hygienic items and,

on at least one occasions, Plaintiff was provided with extra toilet paper.  (Dfts. Ex. A, p. 258.)

20

In his opposition, Plaintiff does indicate that he did complain about the lack of hygienic items, but offers no evidence that any of the named defendants in this action knew that Plaintiff was deprived of hygienic items and acted with deliberate indifference, causing injury to Plaintiff. Plaintiff makes no allegation, and offers no evidence, that any individual defendant knew of a particular harm to Plaintiff and disregarded it, causing injury to Plaintiff.

### 5.   Temperature

The Eighth Amendment guarantees adequate heating.  Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir. 1980).  Plaintiff alleges that the temperature in his cell was so cold, that he was unable to sleep "without always having to stand and pace to try to get warm."  (Am. Compl. P. 4.)  In his deposition, Plaintiff establishes the following:

> Q.  On what do you base your estimate of the temperature plummeting to 40 to 50 degrees at night in your cell?
>
> A.  I remember asking one nurse what was the temperature, and she told me like 50 degrees.  It felt like it was colder inside the cell.
>
> Q.  Do you remember the identity of the nurse?
>
> A.  No.
>
> Q.  Was it a male nurse or female nurse?
>
> A.  Female.
>
> Q.  Okay.  When you asked her what the temperature was, was she standing in your cell with you or was she on the other side of the cell door?

21

A.  On the outside.

Q.  When you asked her what the temperature was, do you recall whether she consulted a thermometer or not before responding to you?

A.  She checked the thermometer and told me a temperature of like 50 degrees.

Q.  When she consulted the thermometer, was the reading of the temperature within your cell?

A.  No.

Q.  Was it a reading of the temperature within some portion of the OHU?

A.  I believe so.  Like every day, daily they check the temperature and they record it.  The cells are colder than it is outside the cell.

Q.  So in response to your request or your complaint about the temperature, she gave you an immediate response?

A.  I wouldn't say immediate, but it took her – took her like a minute to respond.

Q.  When you say she looked at a thermometer, where was the thermometer?

A.  I think it was in the middle of OHU, like right in front of the control booth, control station where the C/Os be at.

Q.  Was it some distance away from your cell?

A.  Correct. Yes.

Q.  And when she checked that thermometer, did she have to leave your cell and return or did she stay there throughout the whole time you guys were conversing?

22

1
2
3          A.  She had to leave and return.

4          Q.  But you were confident when she gave you a temperature
5          estimate that that temperature would be consistent with the
           temperature in your cell as well?
6
7          A.  No, I determined that it must have been like ten degrees lower
           in my cell.
8
9       (Pltf. Dep., 35:13 - 37:9.)

10          Plaintiff offers no evidence, other than his subjective opinion, that the temperature inside

11   of his cell was so cold that it constituted deliberate indifference.  Plaintiff's deposition

12   establishes that it was "like 50 degrees" by the control booth.   Plaintiff offers no objective

13   evidence that any individual Defendant caused his cell to be inadequately heated.

14          Defendants' evidence establishes that on August 18, 2002, the temperature in the building

15   ranged from 74-76 degrees.  The median temperature that day was 76 degrees. Defendants'

16   Exhibit B are copies of inside temperature records for CCI OHU.  Page 312 of Exhibit B

17   establishes that the median temperature was described as above.   On August 19, 2002, the

18   temperature in the building ranged from 74-77 degrees.  The median temperature that day was 74

19   degrees. (Id., p. 313.)   On September 16, 2002, the temperature in the building was 72 degrees.

20   (Id., p. 314.)   On September 17, 2002, the temperature in the building was 72 degrees. (Id., p.

21   315.)  On September 18, 2002, the temperature in the building was 72 degrees. (Id., p. 316.) On

22   September 19, 2002, the temperature in the building was 72 degrees. (Id., p. 317.)  On September

23
24
25
26                                              23
27
28

22, 2002, the temperature in the building ranged from 72-73 degrees.  The median temperature that day was 72 degrees.  (<u>Id</u>., p. 318.)    On September 23, 2002, the temperature in the building ranged from 72-73 degrees.  The median temperature that day was 72 degrees.  (<u>Id</u>., p. 319.) On September 24, 2002, the temperature in the building was 72 degrees. (<u>Id</u>., p. 320.)   On September 26, 2002, the temperature in the building was 72 degrees. (<u>Id</u>., p. 321.)  On September 29 2002, the temperature in the building was 72 degrees. (<u>Id</u>., p. 322.)  On September 30, 2002, the temperature in the building ranged from 71 to 72 degrees.  On November 13, 2002, the temperature in the building ranged from 67-71 degrees.  The median temperature that day was 70 degrees. (<u>Id</u>., p. 325.)  On November 14, 2002, the temperature in the building was 70. (<u>Id</u>., p. 326.)  On November 15, 2002, the temperature in the building ranged from 68-70 degrees.  (<u>Id</u>., p. 327.)  On January 8, 2003, the temperature in the building was 72 degrees.  (<u>Id</u>., p. 328.)  On January 9, 2003, the temperature in the building was 72 degrees (<u>Id</u>., p. 329.)  On January 10, 2003, the temperature in the building was 72 degrees.  (<u>Id</u>., p. 330.)   On January 20, 2003, the temperature in the building ranged from 71-72 degrees.  The median temperature that day was 72 degrees.  (<u>Id</u>., p. 332.)  On January 21, 2003, the temperature in the building ranged from 70-72 degrees.  The median temperature that day was 71 degrees.  (<u>Id</u>., p. 333.)

Regarding Plaintiff's allegation that the cell was so cold that he could not sleep, Defendants' evidence, in the form staff observations and notes while Plaintiff was housed in OHU, establish that Plaintiff slept as follows.  On September 17, 2002, Plaintiff slept for seven hours.  (<u>Id</u>., p. 163, 167.)    On September 18, 2002, Plaintiff slept for six hours.  (<u>Id</u>., p. 161,

24

166.)    On September 19, 2002, Plaintiff slept for seven hours.  (Id., p. 159, 169.)   On October

16, 2002, Plaintiff slept for six hours.  (Id., p. 186.)  From November 13-15, Plaintiff slept two,

eleven, and five hours, respectively.  (Id., p. 210-112.)  Plaintiff slept two hours on January 17,

2003, the night he was admitted.  (Id., p. 266.)   Plaintiff slept twelve hours on January 18, ten

hours on January 19, six hours on January 20, and seven hours on January 21, 2003.  (Id., pp.

255, 257, 259, 262- 265.)

   Defendants correctly argue that Plaintiff's claims that he was made to live in a cold cell

and went without sleep are "simply devoid of evidentiary support."  At most, Plaintiff comes

forward with evidence that a correctional officer told him that the temperature was "like 50

degrees" on one occasion.  Defendants' evidence establishes, without dispute, that the

temperature in OHU, on the days stated, never fell below 67 degrees, and that Plaintiff mostly

slept regularly.  Further, Plaintiff offers no evidence of any kind that establishes that any

individual defendant in this action forced Plaintiff to live in a cell without adequate heating.

**IV.    Conclusion**

   The Court finds that Defendants have met their burden on summary judgment.

Defendants' evidence establishes, without dispute, that they were not deliberately indifferent to a

serious risk to Plaintiff's health or safety, resulting in injury to Plaintiff.  Simply put, Plaintiff's

generalized allegations that correctional officials in general subjected him to inhumane

conditions of confinement is unsupported by the evidence.  The Ninth Circuit has noted that

"[P]rison officials have to have some means of controlling violent or self-destructive inmates

25

temporarily until the episode passes . . .similarly, in an emergency, prison officials are not culpable when they put an inmate who imminently threatens or attempts suicide temporarily in a place where he cannot hurt himself." Anderson, 45 F.3d at 1315.  The evidence is undisputed that Plaintiff was suicidal on the dates at issue.  Although conditions in the OHU were spartan and uncomfortable, Defendants have exhaustively demonstrated, without dispute, that no individual defendant knew of and disregarded a serious risk to Plaintiff's health or safety, resulting in injury to Plaintiff.  Plaintiff offers no evidence to the contrary.  Judgment should therefore be entered in favor of Defendants and against Plaintiff.

Accordingly, IT IS HEREBY RECOMMENDED that Defendants' motion for summary judgment be granted, and judgment be entered in favor of Defendants and against Plaintiff.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.   The parties are advised that failure to file objections within the specified time waives all objections to the judge's findings of fact.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).  Failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **June 26, 2013**            **/s/**

**Gary S. Austin**

UNITED STATES MAGISTRATE JUDGE

27